**Affirmed and Memorandum Opinion filed December 18, 2018.**



In The

# Fourteenth Court of Appeals

NO. 14-18-00578-CV

## IN THE INTEREST OF C.W., A CHILD

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 89737-F**

## M E M O R A N D U M   O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The trial court terminated the parental rights of B.W. (Mother) and appellant S.W. (Father), respectively, with respect to their son, Connor.[1] The trial court also appointed the Texas Department of Family and Protective Services (the Department) to be Connor's managing conservator.

On appeal, Father challenges the sufficiency of the evidence to support

---

[1] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

termination and contends the trial court erred in appointing the Department as Connor's managing conservator. We conclude legally and factually sufficient evidence supports the trial court's findings that (1) Father endangered Connor, and (2) termination of Father's parental rights is in Connor's best interest. We further conclude the trial court did not abuse its discretion in appointing the Department as managing conservator. Therefore, we affirm the trial court's judgment.

## BACKGROUND

### A. A year of Family Based Safety Services

Connor was born into a volatile marriage plagued by domestic violence. In late 2015, when Connor was nearly two years and three months old, each parent was arrested for assaulting the other and referred to the Department for neglectful supervision of Connor. The Department's Family Based Safety Services (FBSS) division accepted the case, and Connor was placed with his maternal grandparents through a Parental Child Safety Placement agreement (PCSP).

During the first few months the case was in FBSS, Mother and Father both refused to engage in the services offered, contending they were unnecessary. Father, said to be using methamphetamine, refused to submit to drug tests. The next several months saw ups and downs in the parents' marital relationship, progress with services, and compliance with the PCSP.

The parents ultimately completed their services, so FBSS closed the case in mid-December 2016. Father had yet to submit to a drug test, though, so his visits with Connor were still required to be supervised. At that time, Mother and Father were supposedly separated. Mother and Connor lived with Grandparents and were forbidden to reside with Father.

## B.    Removal

On Christmas Day 2016 or shortly thereafter, Mother took Connor to Father's house but did not return to Grandparents' house. Mother told Grandmother "they" would be leaving the next week to go to Tennessee. The record does not indicate whether "they" are Mother and Connor, Mother and Father, or all three. Grandmother reported this development to the FBSS caseworker on December 27.

Based on the parents' history with FBSS, the Department worried Connor was in danger. The Department formally removed Connor from his parents' care on December 28, placed him back with Grandparents, and the following day filed this suit for protection of a child, conservatorship, and termination of parental rights. The trial court signed an emergency order of protection appointing the Department as Connor's temporary managing conservator. That appointment was confirmed after a full adversary hearing. Connor stayed with Grandparents, and the parents were named possessory conservators with the right to supervised visitation.

## C.    Family service plan

The trial court signed an order requiring Mother and Father to comply with the family service plans the Department created for them. Father's service plan noted the Department's concerns about his history of substance abuse, history of domestic violence, refusal to participate in services, failure to stay in contact with the caseworker, and failure to provide Connor a safe and stable home. So he could ameliorate those concerns, Father's service plan required him to, among other things: (1) maintain contact with the assigned caseworker; (2) allow announced and unannounced visits to his home; (3) submit to a psychosocial evaluation and follow the evaluator's recommendations; (4) complete a substance abuse assessment and follow the assessor's recommendations; (5) complete individual therapy and follow the therapist's recommendations; (6) submit to random drug testing and test negative

3

at all times; (7) complete a domestic violence course; (8) maintain safe, stable housing and provide the caseworker with a copy of the lease agreement or ownership documents; and (9) attend all court hearings and permanency planning meetings.

### D. Trial

The case was tried to an associate judge in June 2018, when Connor was almost five years old. Grandmother, Father, Mother, caseworker Angela Killian, and Father's aunt Sarah testified. Father did not call witnesses. The Department's documentary evidence included judgments reflecting three of Father's criminal convictions and Father's family service plan along with the order adopting it as a court order. Father offered a certificate of completion of counseling and a document regarding one of the visits he had with Connor at a Department office, both of which were admitted over the Department's objection. Connor's attorney ad litem offered photos showing certain injuries to Mother, which were admitted without objection.[2]

#### 1. Evidence about Father

##### a. Domestic violence

Father offered varying accounts of domestic violence between Mother and him. When asked if he ever hit Mother, he first answered, "In a sense, yes; but in a sense, no." He then changed his answer to "I've never hit her," and changed again to "We've laid hands on each other." He described Mother as "very violent" and characterized their relationship as "toxic." Father said she sustained the injuries shown in the admitted photos accidentally. In particular: (1) her black eye resulted from their "roughhousing"; (2) one burn to Mother's face was "just like a carpet burn from the back of the couch where she hit her eye"; and (3) a second burn to her face was due to her "jumping up in [Father's] face after she jumped in the back of [his]

---

[2] Because Mother has not appealed, we discuss evidence about her only when relevant to Father.

truck and all kinds of stuff trying to break [his] window . . . and [Father] had a cigarette in [his] mouth and that's how she burned herself." Father said he did not know how Mother "busted up" her mouth.

Mother told the opposite story. She testified Father hit her "all the time," which she quantified as at least twice a week. She also said he shoved her while she was pregnant with Connor. Mother contended Father was always the aggressor, not her. She said her black eye developed after Father punched her, as did her busted lip, and both burns resulted from his putting his cigarettes out on her face. She also testified he previously extinguished cigarettes on her genitalia.

Grandmother testified she did not see Father hit or otherwise abuse Mother, but she saw the injuries Mother sustained from what Mother described as assaults by Father. Grandmother routinely picked up Mother and Connor after Mother made outcries of abuse to her.

### b. Use, sale, and manufacture of drugs

Father admitted he smoked methamphetamine regularly during Connor's lifetime. He said he used drugs on weekends with friends. He denied selling or manufacturing any drug. Mother testified she saw Father use methamphetamine and "pills" and asserted "[h]e had a pill in [his] mouth probably 24/7." Further, she said, she saw him both sell and manufacture methamphetamine, "pills," and crack cocaine. Father's aunt, Sarah, did not personally see Father use drugs. However, she said Father and her son spent a lot of time together and, based on her son's usual condition following those meetings, she believed the two men used drugs together.

Grandmother testified Father's residence, a small trailer she estimated to be approximately 12 feet long, was filled with television screens. The screens showed the land surrounding the trailer, including an area where pit bull dogs were kept. Father said the trailer was bigger, maybe 22 or 23 feet, and he installed surveillance

systems to protect his property outside. That property, he asserted, included boats, cars, and "all kinds of stuff."

### c.     Criminal history

Father was convicted in February 2010 of theft of property, a class A misdemeanor. The record does not reflect his sentence for that offense. In early 2011, Father pleaded nolo contendere to possessing two ounces or less of marijuana the previous year. The criminal court accepted his plea, found him guilty, sentenced him to three days' confinement in county jail, and suspended his driver's license for one year. Father was arrested again in July 2011 for two counts of misdemeanor assault causing bodily injury. He pleaded guilty to each charge and was sentenced to serve 365 days in county jail, but the court suspended the sentences and placed him on community supervision for one year.

In July 2017, during the pendency of this case, Father was arrested for possession of a controlled substance. He and the State reached a plea-bargain agreement for two years' imprisonment. Father served 11 months of that sentence and was released after the trial in this case began but before he testified.[3]

### d.     Service plan

Father failed to satisfy the majority of his service plan's requirements. He submitted to a psychological evaluation, but he did not follow the evaluator's recommendations, which included a parenting class. He also failed to complete a domestic violence class, drug and alcohol assessment, or individual therapy.

### e.     Willingness and ability to parent Connor

Accounts vary as to Father's involvement in Connor's life. Father testified he prepared "hundreds" of meals for Connor while they lived together; Mother said

---

[3] The trial began June 7, 2018 and resumed June 22, 2018 for its second and final day.

Father never made him a meal. Father contended he attended all of Connor's medical visits that occurred when he was not working; Mother said he attended none.

According to Grandmother, Father visited Connor infrequently both during the FBSS stage of the case and following removal. She testified Father saw Connor at Grandparents' house no more than five times while the case was in FBSS. During those visits, she said, he spent "about five minutes" with Connor and the remaining time arguing with Mother. Father, by contrast, testified he had seen Connor "a bunch . . . at least twice a week" since he had been in Department care. Grandmother believed Father last visited Connor in January 2016, shortly after Connor was removed. That visit occurred at a Department office. She said Father failed to appear for a couple of visits after that, and future visits were cancelled as a result.

Contrary to Grandmother's recollection, the record reflects Father visited Connor at a Department office in February 2017. The Department employee who supervised that visit filled out a document summarizing the visit, noting Father behaved appropriately during the visit, Connor was happy to see Father, Father reminded Connor to walk instead of run in the hallway, Father played well with Connor, and Father focused on Connor during the visit. For his part, Father described the visit as "[g]reat considering being in a 10x20 room with my son and there is no reason for this!" He also wrote, "I'm ready to have my son instead of it being like we are in jail." Caseworker Killian testified Father later told her he would not visit Connor at a Department office.

Grandmother testified Father never offered to provide financial support after Connor moved in with Grandparents, nor did he send him letters, toys, or anything else. Father acknowledged he did not support Connor financially during his 11-month incarceration but said he sent him small gifts and several letters.

Father admitted he was not able, at the time of trial, to provide a safe and

7

stable home for Connor but believed his rights should not be terminated. He testified he wanted Connor to stay with Grandparents while he got back on his feet.

### 2.      Evidence about Connor

By all accounts, Connor thrived in Grandparents' care. Killian said it took some time to "get him to the point where he felt good about himself." Grandmother testified Father's failure to appear for visits used to upset Connor, and that is why scheduled visits stopped. As of the time of trial, she said, Connor had not asked about Father for roughly a year.

Connor graduated from pre-kindergarten shortly before trial. He had recently participated in a pageant and been named an all-star student and student of the month. Connor was set to compete in a kids' cook-off. Killian testified Grandparents were meeting all of Connor's physical and emotional needs, and she was confident they were a good permanent placement for Connor.

Connor's emotional needs changed radically in October 2017, shortly after he turned four, because Mother murdered a woman who lived near Grandparents and whose son frequently played with Connor. Killian said, "[W]e all went into protect mode" at that time due to Connor's tender age. Mother was convicted a month before the termination trial began and sentenced to 50 years' imprisonment. Grandparents had been telling Connor she was out of town. Grandmother intended for Mother to speak to Connor as often as possible, but Killian was not sure that freqency of communication was in Connor's best interest.

### 3.      Trial court's findings

The associate judge announced his findings on the record. Excerpts of those findings include:

If the Court takes the father's testimony alone, he testified that he used

drugs, including meth, that he engaged in services in 2016 and then he got himself arrested and convicted for possession of meth in 2017 and because of that offense and those actions, he was incarcerated for a period of 11 months. He testified that he continuously allowed the child to be around or in the presence of [Mother], despite the fact that she was violent. According to his testimony, violent towards him on numerous occasions; and yet he continued to have the child in the presence of or around that environment.

If I take [Mother's] testimony to be true, then, in addition to all those things that [Father] admitted to and testified to, that he also severely abused [Mother], that he used methamphetamines mere feet from where his child was laying his head, while the child was there and if I take her testimony to be true, he was selling and at times manufacturing methamphetamines or – and selling other drugs.

Based on that testimony, I think it can be inferred from the evidence that [Father] was, in fact, running an illicit drug business because he claims that he was using the surveillance equipment to protect his property and his trailer home. I believe that another inference can be drawn from that and that he was running a drug business and for that reason had the surveillance equipment.

. . .

Where did [Father] go after he got done smoking the meth outside of the house? Well, he went back in the house where the child was. Where did this violence, this physical abuse occur? That happened with the child there. . . .

I don't believe that [Father] . . . was the only violent actor in this relationship. I don't believe that. . . .

I do think that her, obviously, [Mother's] testimony is significantly – there is a concern about bias. With regard to best interest of the child, the fact that the caseworker perhaps only articulates one reason, does not mean that the Court can't infer from the evidence and the behavior of the parties that it is in the best interest of the child to protect this child since it appears to me that neither parent is willing or able to do so.

Dad said that he would like to have a second chance. Well, I would submit that he's had more than a second chance. His second chance

happened back when CPS took his child and while CPS had custody of his child. Instead of doing what he was supposed to be doing, he was engaging in whatever it was with the methamphetamine that he claims was not his and down the street but that he pled guilty to possessing.

Instead of engaging in the services and learning from them, he was committing serious crimes or a serious crime that resulted in this incarceration. And as far as the violence goes, I've seen the pictures. I don't buy that mom – I do believe she's violent, but I don't buy that she burned her own face with a cigarette. I don't buy that.

So, I'm all for [Father] starting over. I think that's a good idea. But you could argue that [Connor] gets to start over and is not going to be exposed to two people who are obviously violent and that don't give a rip about anybody but themselves because if they did, they wouldn't be engaging in this behavior that they're engaging in.

. . . . I am concerned that – I'm heartened by the testimony – I think it's good that the child is with grandma. I'm heartened by the testimony that the child is doing well. I'm a little bit concerned about the amount and the type of contact the child will be having with his mother and things told to the child about the reason why Mom is not there. I'm not suggesting that you tell a 4-year-old Mom's never coming back and Mom is in prison or Mom is in prison for murder. I don't know what the right thing to do is. So, I understand why you're waiting a little bit longer until the child gets older. I just worry about telling him something that's not true.

. . . . I am a little worried about the child living near people who are relatives of the victim in this crime. Although, I can't imagine that those folks would hold this child responsible; but sometimes kids don't draw that distinction and can be cruel and might say something. I trust that grandma and grandpa will look after the child and monitor that situation closely.

The associate judge found: (1) Father engaged in the conduct described in subsections D, E, and O of Family Code section 161.001(b)(1) and (2) termination of both parents' rights was in Connor's best interest. He recommended Mother's and Father's parental rights be terminated and the Department be named as Connor's

sole managing conservator. The district judge adopted the associate judge's recommendations. Father appealed.

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights can be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including

11

disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II. Predicate ground for termination: Endangerment (subsection E)

In his first two issues, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings regarding subsections D, E, and O of section 161.001(b)(1) of the Family Code.

### A. Legal standards

Subsection E of Family Code section 161.001(b)(1) requires clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct both before and after the Department removed the child from the home is relevant to a subsection E inquiry. *S.R.*, 452 S.W.3d at 361 (considering pattern of criminal behavior and imprisonment before and after removal).

A finding of endangerment under subsection E requires evidence the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *Id.* at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

## B.    Application

***Domestic violence.*** "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Father said he "never laid a hand on [Mother]," then changed his story to "we've laid hands on each other." By contrast, Mother testified Father hit her "all the time," and Grandmother described her observations of Mother in the immediate aftermath of many of Father's alleged assaults. Father and Mother offered different explanations for Mother's injuries depicted in the photos. On appeal, Father acknowledges Mother's and Grandmother's testimony regarding domestic violence but contends their bias renders it insufficient to support termination. As the fact

13

finder, the trial court was the sole arbiter of witness credibility. *A.B.*, 437 S.W.3d at 503; *H.R.M.*, 209 S.W.3d at 109. The associate judge specifically noted his "concern" about the bias in Mother's testimony. Despite that bias, however, the associate judge stated, "I don't buy that mom – I do believe she's violent, but I don't buy that she burned her own face with a cigarette. I don't buy that." We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder could have rejected—and in this case, did reject—as not credible. *L.M.I.*, 119 S.W.3d at 712.

*Substance abuse.* A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *S.R.*, 452 S.W.3d at 361–62. By using drugs, the parent exposes the child to the possibility the parent may be impaired or imprisoned and, therefore, unable to take care of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). Father admitted he smoked methamphetamine weekly after Connor was born. Mother testified Father used drugs much more frequently, asserting he had a "pill" in his mouth "24/7." Sarah testified that based on the frequent condition of her son, who spent time with Father, she believed the two men used drugs together.

*Criminal activity.* A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered

the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492. Father was arrested for possession of a controlled substance in July 2017, more than 18 months after the Department became involved in Connor's life and more than six months after Father learned he could lose custody of Connor if he engaged in criminal activity. He pleaded guilty to that charge and was sentenced to two years' imprisonment. Father denied selling or manufacturing drugs, but Mother said she saw him sell and manufacture cocaine, "pills," and methamphetamine. Grandmother testified about the television monitors in Father's small trailer, which Father said were connected to surveillance cameras he used to protect his property. The associate judge "inferred from the evidence that [Father] was, in fact, running an illicit drug business . . . for that reason had the surveillance equipment."

## C. Conclusion on endangerment

The evidence supports a finding that Father endangered Connor through his physical abuse of Mother, long-term and regular drug use, and criminal activity. Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Father engaged in conduct described in section 161.001(b)(1)(E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Father endangered Connor. Accordingly, the evidence is legally and factually

sufficient to support the trial court's finding regarding subsection E. We do not review the finding regarding subsections D or O. *A.V.*, 113 S.W.3d at 362. We overrule Father's first and second issues.

## III. Best interest

Father's third issue challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in Connor's best interest.

### A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment*, id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating

a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

### B. Application

#### 1. Connor

*Desires.* When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205. The evidence is undisputed that Connor, who has lived with Grandparents since shortly after he turned two years old, has bonded with and is well cared for by them. He has spent relatively little time with Father, which the fact finder could have reasonably inferred resulted from Father's refusal to visit Connor in a Department office.

*Needs.* Killian testified Grandparents are meeting all of Connor's physical and emotional needs. She expressed some apprehension about Grandmother's stated intent to have Connor speak with Mother frequently in the future. The associate judge echoed that reservation, as well as his concern that Connor lives close to the victim's family, but said he trusts Grandparents "will monitor the situation closely."

*Stability of proposed placement.* The Department planned to keep Connor with Grandparents. Killian and Mother both testified they had no concerns with that arrangement. Father, too, agreed Connor should stay with Grandparents even if his parental rights were not terminated.

#### 2. Father

*Predicate grounds under Family Code section 161.001(b)(1).* Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the children's best interest.

*See C.H.*, 89 S.W.3d at 27. Accordingly, the evidence of Father's endangerment of Connor, discussed above, is relevant to the best-interest analysis.

***Failure to complete service plan.*** Father underwent a psychological evaluation but did not satisfy any of his service plan's other requirements. Of note, he failed to complete therapy, a substance abuse assessment, or classes on parenting or domestic violence.

***Willingness and ability to parent.*** Father testified he loves Connor, and several witnesses testified Connor seemed happy when they observed him in Father's presence. A Department employee noted Father interacted well and appropriately with Connor at one visit. On the other hand, Grandmother testified Father squandered his few visits with Connor by spending most of the time arguing with Mother. Father reportedly told Killian he would no longer visit Connor in a Department office.

***Programs available.*** Father had two opportunities to engage in services designed to help him parent Connor: during the year this case was in FBSS, then during the 17 months between removal and trial. The associate judge stated, "Instead of engaging in the services and learning from them, he was committing serious crimes or a serious crime that resulted in this incarceration."

## C.    Conclusion on best interest

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Father's parental rights is in Connor's best interest. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed that belief or conviction.

Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights is in Connor's best interest. We overrule Father's third issue.

## IV. Conservatorship

In his fourth issue, Father asserts the evidence is legally and factually insufficient to "support a finding that appointment of [the Department] as managing conservator is in [Connor's] best interest." We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion, not for sufficiency of the evidence, and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

The body of Father's argument makes clear his challenge is to termination, not appointment of the Department as Connor's managing conservator. He contends the trial court should not have terminated his parental rights because the status quo—Connor's living with Grandparents while Father has supervised visitation rights—was satisfactory. As discussed at length, the evidence is sufficient to support termination of Father's parental rights.

If the trial court terminates the parent-child relationship with respect to both parents or to the only living parent, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). The appointment may be considered a "consequence of the termination." *L.G.R.*, 498 S.W.3d at 207.

Having terminated Mother's and Father's parental rights, the trial court was required under section 161.207 to appoint the Department or another permissible adult or agency as Connor's managing conservator. *See In re K.M.R.*, No. 14-17-00651-CV, 2018 WL 614762, at *13 (Tex. App.—Houston [14th Dist.] Jan. 30,

2018, pet. denied) (mem. op.). Father offers no argument as to how the trial court abused its discretion in naming the Department, rather than another permissible adult or agency, to be Connor's managing conservator. We overrule Father's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    Tracy Christopher
Justice

Panel consists of Justices Boyce, Christopher, and Jewell.